MRAMOR *v.* CHAPMAN.

(No. 82 CIV 0784 — Decided January 12, 1984.)

Court of Common Pleas of Lake County.

*Eugene A. Lucci,* for plaintiff.
*Edward I. Stillman,* for defendant.

MITROVICH, J. The within matter is a motion for prejudgment interest filed by plaintiff pursuant to R.C. 1343.03(C). The plaintiff requests prejudgment interest upon a money judgment rendered by a jury on November 17, 1983, in the amount of $15,000. The matter was tried on a claim of medical malpractice.

The statute provides prejudgment interest against the judgment debtor if a good faith effort to settle the case was not made. Two cases are presented for consideration of the court: *Holmes* v. *Lombardo Investment Builders* (Feb. 1, 1983), Cuyahoga C.P. No. 996531, unreported, and *Ware* v. *Richey* (1983), 14 Ohio App. 3d 3. Both decisions attempt in some measure to define the phrase,

"* * * failed to make a good faith effort to settle the case * * *." Each court views the alleged lack of "good faith" in the negative and derogatory sense. These courts hold there must be the presence of "insincerity," "dishonesty" or "duplicity," and the manner of applying these terms is akin to evil motive or intent. If these elements are not present, claimant has not shown lack of good faith.

Every litigant has a right to avail himself of all the benefits of the judicial system. One benefit is to require the claimant to prove before a jury that which he claims. Such a litigant is not obligated to settle the matter without his day in court and, in line with this, R.C. 1343.03(B) only requires interest to be paid from the date of judgment. The legislature has, however, carved out an exception in R.C. 1343.03(C), which requires a showing of bad faith. What then must the claimant prove to be entitled to prejudgment interest?

The recognition of the concept of prejudgment interest by the legislature is one of economics. The legislature may or may not have intended that prejudgment interest act as a penalty for failure to reasonably settle a case without trial. If the definition of "good faith," or its opposite, "bad faith," is in the negative or derogatory sense, then it can reasonably be concluded it was intended to penalize the user of bad faith. Obviously, if this were the purpose of the legislature, the public policy would be that all litigants are given fair warning to approach their causes of action and defenses in such a fashion as to recognize one's obligations, make a fair analysis of them and settle the issues without court intervention. Such public policy would have the obvious effects of reducing litigation, reducing crowded and overworked trial court dockets and courts of appeals dockets, as well as resolving rapidly the issues of the community so the parties can go about their business.

Nothing in this opinion should be construed as this court condoning the attitude that any litigant be prevented from exercising any right or privilege he may have under the law and Constitution of this state. However, the litigant ought to have some direct responsibility for the manner in which he chooses to conduct his case.

If the concept of penalty is discounted, and economic aspects are addressed, a much different view is apparent. Trial practitioners are well aware that the judicial process which aspires to the full and reasonable litigation of every claim and corresponding defense is, by its very nature, a potential source of abuse. Forcing a claimant with a legitimate and real cause of action to file a claim in court, expend large sums of money to hire attorneys, prepare experts, take depositions, etc., has the effect of driving up the cost of justice. High costs and large pretrial outlays are hardly conducive to a "fair" system of administering the judicial process. Many litigants are keenly aware of the growing costs of litigation and directly rely upon the economic realities to force lower settlements as the legal system more and more becomes a rich man's tool.

In the case at bar, the defendant was a physician who had performed a surgical procedure upon the plaintiff by cauterizing her fallopian tubes. Two years later, a tubal pregnancy resulted, causing a bursting of a fallopian tube. Internal hemorrhaging occurred, necessitating an operation, whereupon plaintiff's abdominal cavity was opened and the tube removed and the damage repaired. The operative report which the plaintiff produced to the defendant at the outset of the case indicated a substantial basis to believe that the tube in question had not been properly cauterized. The report indicated the tube was open, thus accounting for the pregnancy. The more than reasonable inference to be drawn was that the defendant-doctor failed to perform the medical procedure properly and therefore was negligent.

During the pretrials, defendant refused to make any reasonable offer of settlement, not even the standard "nuisance value offer," often made to dispose of cases when the defendant feels no liability exists, but does not wish to expend the funds to completely defend the case.

The case at bar was defended by the defendant's insurance company, which, in reality, made the decision against offers of settlement and decided to litigate the matter to a jury. The policy of insurance does not require the insured to concur in the settlement; however, the defendant was adamant that he had not been negligent in performing the surgical procedure. The plaintiff contends as a result of the insurance company's lack of desire to make a meaningful offer of settlement, she was required to expend $11,952 for expert fees, depositions, attorney fees, and other costs, retaining $3,057.33 out of a judgment of $15,000. This is contrasted by some of the defendant's expert witnesses' testimony that they were not charging the defendant an expert fee.

Plaintiff has won a hollow victory. She has brought her cause of action to an impartial tribunal, but to prevail, was required to expend almost her entire judgment. Such a result is not only bad economics, it is not even one in which the victor can feel justice was done.

One can argue that the decision was for the plaintiff to make regarding whether or not the economics justified the suit. The plaintiff could have avoided the large expenditure of funds by settling the matter. The insurance company on the other hand did not offer either $3,057.33 or the nuisance cost, or the cost of the medical expenses, as is sometimes customary in settlement of litigation.

Defendant's counsel has indicated to the court that the insurance company had instructed him to go forward with the suit and now that it has lost, to file an appeal. Certainly an appeal will swiftly reduce the lion's share of $3,057.33, leaving plaintiff with nothing for her injury even if she prevails. If the case is thereafter appealed, or reversed and remanded, plaintiff will be required to suffer further loss. No matter what the perspective, the result is unjust and unfair. Obviously, the jury had no knowledge that plaintiff was to realize $3,000 on the judgment. The results certainly would have been different if they were entitled to that knowledge.

The law in Ohio is such that plaintiff may not recover unless and until an expert testifies to support the claim. The law requires an extreme monetary burden without any view to reimbursement for the cost of the litigation. While the plaintiff is being forced to face the expenditure of funds, the insurance company is lawfully able to retain its monies and can invest them to realize a profit.[1] During the period of litigation, plaintiff is denied the use of the funds which the evidence indicates she had a reasonable prospect of obtaining. The insurance company ought to have negotiated and made reasonable offers of settlement. The insurance company chose a course of action knowing the greatest economic burden was upon plaintiff and the least burden upon itself.

The insurance company was not dealing with another giant company which was entitled to certain tax benefits for expending money in "doing business." Plaintiff is a private citizen, not entitled to business tax deductions for litigation expenses, and is tied to a simple concept of income over expenditures. Since the insurance company is able to enhance and benefit from its position, it is not unreasonable to recognize that in making plaintiff whole, she ought to have the benefit of winning her case from the date the cause of action accrued, and not from the date of her judgment.

It is obvious that this result is not appropriate in all cases, but when the economic benefits are so subordinated by an opposing side taking advantage of its legal rights, those legal rights must cost something. In this case, it is the interest for the use of the money. This also is the defendant's cost of doing business in the fashion it chooses. In the last analysis carrying on a tight-fisted business is to be applauded as that is the stuff of success. But to calculate and devise one's business affairs to take more than a reasonable advantage of another is not legal justice, nor is it fair play; in other words, it is not "good faith."

The insurance company and its attorneys are experts in the litigation field. They are not novices getting their first experience in the legal system. Their daily endeavor is working with loss rates, judgment statistics, and court procedure. The probability of success in a particular case is discussed and debated with the knowledge that they can apply economic pressure in furthering their case. But if they do not calculate properly and lose a case, they still have the benefit of interest and use of the funds during litigation. If the plaintiff is correct and has been put through the test of her cause, why shouldn't she have the benefit of her proof? After all, the insurance company elected the course of the litigation.

Good faith is, in law, a difficult term at best to explain. Webster's New World Dictionary (2 College Ed.) does not con-

---

[1] The system of insurance reserves affords insurance companies the opportunity to reinvest funds reserved for payment of claims along with certain tax advantages not open to plaintiff.

tain a definition of the term; while Black's Law Dictionary (5 Ed. 1979) 623 defines the term as follows:

"* * * Honesty of intention, and freedom from circumstances which ought to put the holder upon inquiry. An honest intention to abstain from taking any unconscientious advantage of another, even through technicalities of law, together with absence of all information, notice, or benefit or belief of facts which render transaction unconscientious. * * *"

The court of appeals in *Ware* v. *Richey, supra,* at 9, cited by the defendant, defines "good faith" as follows:

"A lack of good faith (the equivalent of bad faith) requires more than bad judgment or negligence. Rather, it imports a dishonest purpose, conscious wrongdoing or breach of a known duty based on some ulterior motive or ill will in the nature of fraud. * * *"

Certainly this definition can apply to bad faith, but again it imports the use of such terms as fraud, dishonest purpose, and conscious wrongdoing. These words take a negative and derogatory approach to the definition. But, conversely, bad faith can come about in the legal system from a diligent lawyer representing his client aggressively. Situations can readily be envisioned where the attorney is not as straightforward as he could be. Certainly if dishonest purpose is intended, bad faith exists, but subtle maneuvering without directly misleading is not only considered good gamesmanship, it is not even considered unethical.

The old expression applied to such situations has been labeled, "sharp practice," *i.e.,* not illegal, not dishonest, not really unethical, but such that a proud attorney would not engage in such activities. This is what Black's Law Dictionary, *supra,* calls "taking any un-conscientious advantage of another, even through technicalities of law." To require a party to prove that an insurance company intended to defraud, or was dishonest, or breached a known duty, is impossible in the face of an assertion that the opposing party wished to avail itself of the benefits of the judicial system. Therefore, the statute would be a nullity and no award would ever be possible as all need be claimed is right of access to the courts.

It is common knowledge that some insurance companies, professional associations and other business and industrial associations take the view and actively advertise that all claims are litigated. The attitude is to thwart litigation by increasing costs. Making victory expensive is to limit access to the courts. This is an abuse of the system while the abusers are clamoring to be protected, and, when the intent to limit access to the courts results in calculated monetary benefits, the party electing such course ought to be responsible when the opposing side carries the proof. The party limiting the access to the courts can hardly come to the court on a claim of pureness of heart.

Wherefore, the court finds the defendant did not apply good faith in attempting to settle the case and further finds plaintiff did not apply bad faith in attempting to settle the case and is therefore entitled to prejudgment interest at ten percent from April 27, 1979.

The court further finds that the plaintiff's motion to tax $458.50 as costs for the deposition of Dr. Jeffrey Seiler, be and hereby is granted, and plaintiff's motion to tax as costs $292.50 for personal service of notice and subpoenas be and hereby is granted.

*Judgment accordingly.*